No. 107,556

In the Matter of STEPHEN B. SMALL, *Respondent*.

(294 P.3d 1165)

Opinion filed February 22, 2013.

*Kimberly L. Knoll*, Deputy Disciplinary Administrator, argued the cause, and *Stanton A. Hazlett*, Disciplinary Administrator, was with her on the formal complaint for the petitioner.

*Stephen B. Small*, respondent, argued the cause pro se.

*Per Curiam*: This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against the respondent, Stephen B. Small, of Kansas City, Missouri, an attorney admitted to the practice of law in Kansas in 1986.

On August 24, 2011, the office of the Disciplinary Administrator filed a formal complaint against the respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). The respondent filed an answer on September 20, 2011. A hearing was held on the complaint before a panel of the Kansas Board for Discipline of Attorneys on November 15, 2011, when the respondent was personally present. The hearing panel determined that respondent violated KRPC 8.4(d) and (g) (2012 Kan. Ct. R. Annot. 643) (engaging in conduct prejudicial to the administration of justice and adversely reflecting on lawyer's fitness to practice law).

The panel made the following findings of fact and conclusions of law, together with its recommendation to this court:

### "FINDINGS OF FACT

. . . .

"32. On August 31, 2008, Mary Friedheim entered into a lease agreement with Michael D. and Tammy J. Bluhm, for the rental of her home located at 4100 West 126th Street, Leawood, Kansas.

"33. On October 22, 2008, Ms. Friedheim retained the Respondent to assist her in having the Bluhms immediately removed.

"34. Ms. Friedheim and the Respondent did not enter into a written fee agreement. For the time period from October 22, 2008, through January 30, 2009, the Respondent billed Ms. Friedheim $32,651.13 for the representation. The Re-

spondent billed Ms. Friedheim $250.00 [an hour] for work performed during regular business hours, he billed her $350.00 an hour for after hours work, and he billed her $350.00 an hour for court time.

"35. On Friday, October 24, 2008, the Respondent filed an application for an emergency restraining order or injunction for restitution of property and other relief. As a result, the Respondent obtained an *ex parte* temporary restraining order. The Court ordered the Bluhms to leave. The Respondent drafted a proposed order memorializing the Court's decision. The Court made handwritten changes to the order and signed the order. The Court's handwritten changes included adding the following language:

'The Court will make itself available between the entry of this order & Oct 31, 2008, in the event the Defendants wish to be heard &/or wish to move to set aside this order.'

The Bluhms left Ms. Friedheim's home.

"36. On Monday, October 27, 2008, the Bluhms retained Jerry D. Rank. In behalf of the Bluhms, Mr. Rank requested that the court conduct a hearing on the *ex parte* temporary restraining order.

"37. The court held a hearing as a result of the Bluhms' request. At the conclusion of the hearing, the Court dissolved the temporary restraining order because it disturbed rather than preserved the *status quo*, relief would be available to Ms. Friedheim at trial, and the alleged injury could be cured through money damages. No journal entry was prepared memorializing the Court's October 27, 2008, decision.

"38. On October 28, 2008, the Respondent filed a motion to reconsider and vacate the October 27, 2008, order. Also in his motion, the Respondent sought the disqualification or recusal of Judge Sutherland. The Respondent, however, failed to comply with the procedure for motions for disqualification or recusal, set out in K.S.A. 20-311d. In the motion, the Respondent alleged as follows:

'1.) This case was filed on the afternoon of October 24, 2008 and assigned to Division Three. The court's immediate reaction to the assignment was that the court is suspicious of ex party Injunction—TRO actions filed pursuant to K.S.A. 60-903 late on Friday. After consideration of the verified Petition, arguments of counsel and testimony of the Plaintiff the court granted the 7 page Order supplied by Plaintiff, striking certain portions as "hyperbole."

'2.) On Monday, October 27, 2008, at approximately 9:30 A.M. the court left word for counsel that the Defendants had appeared and engaged in ex parte communication, and that the court was very troubled that counsel did not reveal to the court that the Defendants were operating a business in the residence. The court demanded that counsel be immediately available for a hearing, inferring professional misconduct in concealment of a material fact, but was agreeable that could occur at 1:00 P.M. The court's position resulted from ex parte communication by the Defendants.

'3.) While meeting with Plaintiff in a witness room, the court entered the room and stated that the court wanted to keep the parties separated, one in a witness room and the other in the courtroom initially, that Plaintiff could be brought into the court room after the defendants were seated. The court's sequestration ruling was engendered by the emotional state of the defendants [*sic*] and their ex parte statements concerning the Plaintiff.

'4.) The court then invited counsel to chambers and set down rules as to how the lawyers were to behave, including comments such as instructions not to speak to each other's client, anticipating some sort of violent outburst because the emotions were running high. Neither Plaintiff nor her counsel had demonstrated any emotional outburst. The court's belief that this was necessary was engendered by the ex parte communications of the Defendants.

'5.) During the hearing of October 27, 2008 the court refused to allow counsel to approach the defendant [*sic*] with Exhibits and screamed very loudly "No" at Plaintiff's counsel.

'6.) During the hearing uncontroverted evidence of the following was adduced: . . . [In the motion, the Respondent stated his case as he viewed it, as the uncontroverted evidence.]

'7.) Plaintiff's evidence established all of her allegations set forth in her verified application.

'8.) The law cited in support of the application compels the determination that the Defendants acted contrary to the lease and criminally toward the property and toward Plaintiff.

'9.) The evidence proved the lease was fraudulently procured.

'10.) Notwithstanding the evidence and the law the court determined that while the property was at risk and should be protected from further risk, that the perpetrators of the risk and damage could remain. This is internally inconsistent to the extent to be an abuse of discretion.

'11.) Plaintiff has no remedy at law to prevent further theft and destruction of her property, the only adequate remedy is to remove the Defendants from the emergency which they through their admittedly fraudulently and criminal acts created.

'12.) For the foregoing reasons the court is requested to vacate and make permanent injunctive relief, and to assist in fashioning an appropriate order permitting the removal of the Defendants [*sic*] property.

'13.) Should the court not vacate the Order it is Plaintiff's position that irreparable harm and prejudice have resulted from the ex parte communications initiated by Defendants and or their counsel with the Court which have resulted in transgressions of Judicial Cannons [*sic*] 1,2,3 [*sic*] as evidenced by the conduct of the proceedings.'

"39. After the close of business, the court sent the Respondent and Mr. Rank an electronic mail message regarding the Respondent's motion.

"40. The Respondent responded to Judge Sutherland's electronic mail message. The Respondent also sent the electronic mail message to Mr. Rank and Ms. Friedheim. In the message, the Respondent stated:

'Upon reentry to the premises the defendants immediately commenced accusing my client of stealing their property, and have the police now detaining her in her own house over these fictitious allegations. My client has been polite and cooperative as always, and we have not refused access to the property. If anything is missing it would be by the Defendant's [sic] hand because they retained keys in violation of the TRO to create such an opportunity. This additional behavior is creating an emergency situation.

'The police would feel more comfortable with everyone being excluded from the premises until the matter is further sorted out by the court given the Bluhm's [sic] behavior. The officer's name is Officer Mahon (pronounced "man"). . . .

'I request that the court consider this a further emergency request that the court stay the modification of the order until further order of the court. What is developing is [a] retaliatory tactic by the defendants by commencing malicious and false allegations against the plaintiff to the police, though I don't know the statute, I am certain that this is a crime to behave in such a manner. Surely the court did not intend to create such an opportunity. [sic]'

"41. On November 2, 2008, the Respondent sent an electronic mail message to Mr. Rank which provided the following:

'The attached will be hand delivered to your clients today with the assistance of the police, since you think the law requires the same. We disagree and deliver the notice to avoid any procedural issue in that regard reserving all objections to the necessity of the same.

'The court has no jurisdiction over any non-party including Bluhm Engineering, Inc. nor [sic] any of the other corporations. The court cannot create a lease to a corporation where none existed, it cannot make up a new lease. Urging it to do so was improper and misleading. Your failure to mention that the Lease [sic] provided it was exclusively for residential occupancy by only Mr. & Mrs. Bluhm [sic] and their children has caused a miscarriage of justice, is believed in violation of the rule of law requiring that an attorney not misstate nor mislead the court as to facts or the law.

'As you will see from the enclosed citations none of the corporations have any rights under the Kansas residential landlord tenant act, as confirmed by the federal court. Each of the corporations is a trespasser and demand is made that they leave with their property, but not touch nor damage nor take any of the Plaintiff's property. They must arrange for this office to be present and the Plaintiff and the police will stand by to search ALL PROPERTY TO BE REMOVED to ensure there is no further theft nor misap-

propriation. Demand is made that your clients similarly vacate and the property be similarly searched.

'We will plan on photographing all that is taken to make a record. To the extent the district court ordered otherwise it was mislead [*sic*] by you as to the exclusive residential nature of the lease which you should familiarize yourself with and immediately correct any misrepresentation that any corporation has any right to reside at the premises or store its property there. You would not want to misstate the facts nor the law to the court nor have your client's corporation benefit from a fraud upon the court or a material concealment.

'In the event your clients do not leave we will file our mandamus action in the Supreme Court and you can then explain why you mislead [*sic*] Judge Sutherland, as well as the full extent of any ex parte contact by yourself and your clients.

'Also, I think your proposed journal entry is grossly different than what the court ordered. All that the court addressed was that your clients were permitted to return to the property, the remainder of it is intact in that he continued to insist that they not do anything to touch, use, damage, remove, sell or dispose of Mrs. Friedheim's property. No such language was set forth in your draft. You should recall that the court invited findings of fact and conclusions of law, as well as commanded language to protect the property from conduct by your clients. I will be forwarding you a draft of my own in the next day or two. I have a jury trial set for tomorrow, as well as a number of other pleadings and motions to respond to immediately.

'Please contact me to arrange for your clients to start removing their property. If they are going to use "pods" the pods need to be removed while we are present to ensure nothing else is placed in them in our absence. In the meantime, in my and my client's and the police absence, nothing is to be touched nor removed.

'DEMAND IS MADE FOR THE RETURN OF ALL PROPERTY REMOVED FROM THE PREMISES BY YOUR CLIENTS, AS WELL AS BY OTHERS, INCLUDING THE 1800 POUNDS OF PROPERTY, ANY AND ALL ITEMS PAWNED OR PLEDGED, SOLD OR GIVEN TO ANYONE INCLUDING YOUR CLIENTS CHILDREN OR OTHERWISE. FAILURE TO DO SO WILL BE CONSIDERED THEFT AND CONVERSION.

'IN THE EVENT YOUR CLIENTS FAIL TO IMMEDIATELY TENDER PAYMENT FOR THE UTILITIES THE SAME WILL BE CONSIDERED THEFT.

'To date, attorneys fees in a substantial amount have been incurred for which your clients are at least equitably liable. Most of these fees were incurred as result of their ex parte misrepresentations to the court. We will be moving for or suing for these fees as sanctions and expect joint and

several liability given your complicity in the misrepresentations and ex parte conduct resulting in the Order.'

"42. On November 4, 2008, the Respondent sent Mr. Rank an electronic mail message.

'At your suggestion we served a Notice to Vacate the premises for non-payment of November rent and the other reasons set forth therein. As you know the corporations are not parties to the lawsuit and are trespassing. The court accordingly lacks jurisdiction to enter any order as to them until they are joined. Since the corporations have no lease I believe the police will assist in their removal if necessary though I hope that will not be necessary. We need to be present to inspect the property removed by the corporation to ensure that it does not commit theft as I anticipate that would be your clients argument should further theft occur. Will you be representing the corporations as well as the Bluhms?

'When will your people and the corporations be ready to leave? If they will not commit to a date I will file a supplemental pleading, a Petition for their eviction at 4:35 tomorrow and serve it via fax on you, as well as request a hearing immediately as there will be no delay in service. Please let me know so I can arrange to be present with Mrs. Friedheim and the police to inspect the property to be removed, and attend the inspection of the house.

'We will also be filing a variety of damage claims. Will you be defending those claims? We will move to bifurcate the eviction from the damage claims and I assume you would be agreeable to doing so.'

"43. On November 5, 2008, Mr. Rank sent the Respondent an electronic mail message. The message provided as follows:

'Our clients are still looking into available options at this point, so we can't give you a definitive date when they will be prepared to move. They have no objection to you serving, via fax or delivery to my office, any additional pleadings which you anticipate filing.

'Our firm has been retained to defend all claims alleged by your client in addition to claims which our clients will now pursue as a result of the wrongful removal from the residence and subsequent behavior of you and your client.'

"44. That same day, the Respondent responded to Mr. Rank's message, as follows:

'Your clients were removed from the house by court order, a portion of which survived the fraudulent representations you and your cilent [sic] made to the court ex parte that a business was entitled to be located there, that being that they continue to be under contempt power if they do anything improper toward my client's personaly [sic] or the realty, and that sir, is what brought us to the courthouse in the first place. Given that the relief was necessary to stop conversion, theft and destruction of property your

clients have no claim for "wrongful removal" or otherwise. The subject of your ex parte contact resulting in prejudice and further damage will be further explored as otherwise appropriate along with the perjury of your client.

'If you look at the lease you will see that your clients promised to use the residence exclusively as a residence. There is no business lease and any and all businesses remain trespassers. The court has no authority to create a tenancy in a stranger to the lease and doing so is an abuse of discretion and an unconstitutional, void act, and the court's decision to allow your people back in on condition that they do no more harm to the extent it took sympathy on them was likewise an abuse of discretoin [sic]. Furthermore, the court believed and still does that your client acted wrongfully toward her property, and your client admitted stealing and damaging it. Your client admitted so, which of course may give rise to a malpractice claim against you. Your client has no claims against either me or my client, and if he pursues such claims they will be viewed as defamatory and a matter of malicious prosecution for which the clients and all participating lawyers will be sued. While your clients may not have any money, you should and we'll be happy to pursue you to collect it. As to subsequent behavior, all we have said in the proceeding is litigation privileged for which your client has no action, and with respect to the service of the notice to vacate, that was done at your insistence. Given your clients propensities it was necessary to enlist the police to assist.

'I suggest you cut the rhetoric and tell your people to get another place to go ASAP. SInce [sic] you have confirmed that they refuse to honor the demand for the premises, by [sic] 4:35 today we will ask the court to direct the sheriff to remove them.

'The only alternative I can think of would be for them to post a bond secured by sufficient sureties to cover the entire value of the lease, the personal property and their rent. The bond would be in the amount of the full replacement cost and all contractual obligations. Since your clients represented that they had the money to buy the house it should be no problem for them to post such a bond.

'I have asked you for lien waivers. Either provide the lien waivers or paid receipts for all services and material your client contends they supplied or had others supply the property early today please so it is not necessary to file a count to quiet title. If your client has paid all workmen and materialmen [sic] he should be able to produce the receipts. In any event he and his wife and their companies must supply a lien waiver today.

'I will commence drafting the Petition.'

"45. On November 11, 2008, Mr. Rank wrote to the Respondent, detailing a settlement offer.

"46. That same day, the Respondent responded, rejecting Mr. Rank's settlement offer.

"47. On November 12, 2008, the Respondent filed a motion for an emergency hearing and a request to hold the Bluhms in contempt of court. The next day, the Respondent filed a corrected motion for emergency hearing. The Court provided the Respondent with a date and time that was available on the Court's calendar for the hearing, November 20, 2008, at 2:30 p.m. However, the Court did not set the hearing on the motion at that time.

"48. The Respondent was required to contact Mr. Rank to see if that was an agreeable time for the hearing on the motion. The Respondent failed to do so. However, the Respondent failed to inform the Court that the Bluhms and their counsel had not agreed to that date.

"49. On November 13, 2008, the Respondent again sent Mr. Rank an electronic mail message. The Respondent's message included the following:

'This letter is written under full reservation of all rights.

'The Bluhms unlawfully and contemptuously changed the locks to the Friedheim residence in breach of the lease, as an act of adverse possession, and in violation of Kansas law. Demand is made that all locks be immediately restored to their former settings, at your client's sole expense with proof that all locksmith charges have been paid in full, and that I be notified just as soon as that has been accomplished, and that the keys be provided to my client.

'Demand is made once again for lien waivers from all whom the Bluhms have had do any work on the premises or provide any materials. This is to include the company that Mr. Bluhm testified he hired for $3500 to alter the landscaping. Other than restoring the locks your clients are directed not to have any material man or laborer provide any services or provide any material which may result in the imposition of any lien.

'Demand is made once again for the premises and all contents thereupon existing on August 31, 2008.

'Mrs. Friedheim and her daughter need to obtain clothes from the house, and they will be returning with the police as reasonably necessary to do so. As you know, there is now photographic evidence of the Bluhms' contempt with respect to Mrs. Friedheim's property.

'The substantial ongoing increase in legal expense is something we have requested that the court tax jointly and severally to you and your clients as it has and would otherwise have been avoidable. Additionally, given the Bluhm's [sic] threats it will be necessary to proceed in Mandamus for the injunctive relief if it is not granted in the district court. Your clients can stop the accrual of that expense by complying with demand that they arrange to immediately vacate. If they are not removed by the court by noon tomorrow a mandamus [sic] action will be filed as we are confident that equitable relief is imperative and it was error or an abuse of discretion to

permit [*sic*] Bluhms back on the property, let alone to suffer delay in their removal.

'You should not assist your clients' perpetuation of criminal (false statements to the police, theft, malicious destruction of property, stealing utilities, trespass), fraudulent and tortuous acts (conversion, interference, defamation, etc.). Given the history and Bluhms [*sic*] intent to continue to act improperly, you are ethically obligated to withdraw if you cannot bring them within the law. There is no attorney client privilege in assisting or furthering the criminal or fraudulent acts of a client, and in fact there is joint civil, and criminal liability to the extent you do so. I cannot imagine any client is worth those exposures, or misrepresenting to the court the client would peaceably vacate shortly, but perhaps you view life and the practice differently.

'The lease has terminated, notice has been given to vacate. Bluhms are trespassing. Bluhm's [*sic*] settlement offer is rejected. Bluhm's [*sic*] assertion of removal of jewelry is false and is denied. Mr. Bluhm has now made false statements to the police in addition to committing perjury. Bluhms have not suffered any actionable conduct by nor on behalf of the Plaintiff. Whether Bluhms [*sic*] leave voluntarily or peaceably or not they remain liable for substantial actual and punitive damages the full extent of which are not presently determinable and for which all rights are reserved.

'It is my suggestion that the Bluhm's [*sic*] find somewhere else to stay commencing today, and that you arrange with this office for the Plaintiff and police to be present when they remove their belongings. If they will agree to leave today, I will encourage my client to permit a reasonable period (perhaps a week) within which to accomplish the removal of their belongings. If they do not peaceably surrender possession of the premises today we have and will ask the court to removed [*sic*] them and that any property not removed within 24 hours be deemed abandoned given that they have not held the premises for 3 weeks, sufficient time within which to have found another "option" and to have vacated the premises, knowing of their peril and deciding not to surrender the premises.'

"50. At some point, the Respondent prepared an affidavit in support of his motion to recuse Judge Sutherland. [Footnote: While the affidavit appears to have been notarized on November 14, 2008, it is unclear whether the affidavit was prepared on November 14, 2008, or some other time. Further, it is difficult to establish from the Respondent's billing record when the affidavit was prepared. However, the affidavit was never filed with the Court.] Ross C. Nigro, Jr. notarized the Respondent's signature, stating:

'Before me, a Notary Public for said county and state, personally appeared Stephen B. Small, known to me to be the person who executed the foregoing on this 14th November, 2008 stating the foregoing is true to the best of his knowledge and belief.'

At the hearing on the formal complaint, the Respondent testified as follows regarding his practice in having documents notarized:

'Q. [By the Deputy Disciplinary Administrator] . . . So the affidavit as it relates to the Judge is 30, Exhibit 30.

'A. [By the Respondent] I don't—here's the problem with this affidavit, okay, you'll notice that the signature page does not have any text on it other than a signature block and a notarization. This is a generic notarized signature. This is attached to this. If the billing says I did this on this date then the notarization may be right, but I will tell you one thing, Mr. Nigro does not stay late at the office, so if I want to have my signatures notarized by him, I have to present a signature for him to notarize before he leaves. And so he is not signing anything other than my signature. Now, if you look at page—

. . . .

'Q. —I'm just—it's been my experience with notaries you have to appear in front of them with the document, swear that it is and sign it, are you telling me that you leave a notary—

'A. No. No.

'Q. —a blank sheet?

'A. No, I go to Ross and I say, here, I want you to notarize. I sign the thing and he notarizes. He notarizes my signature. But this signature could be attached to any document I might like to attach it to as my signature.

'Q. So he's—he's—

'A. He merely witnessed the signature. He didn't witness anything but my signature before—

'Q. Okay.

'A. —me appeared in person and signed this document is all he's saying.

'Q. When he says sign this document it is just respectfully submitted with— it's just your signature block, that's what was notarized?

'A. That—what I would normally do if I had a document that wasn't completed and I'd be working late in the night, if I wanted to have my signature notarized I would have my signature notarized. It's not—it doesn't—it doesn't—it doesn't—I don't see that as a legal violation of anything.

. . . .

'A. This—this notary page on here may not even belong to this document. It does have page 12, and, you know—

. . . .

'Q. Sir, I will represent to you and the Panel I got the discs of your file that you presented and this is how it was presented with that signature page as part of the affidavit.

'A. Oh, no, no, no, I'm not suggesting that you've—what I'm saying I may have had a loose notarized thing in the office and attached it to it. I can't tell

you.

. . . .

'A. I'm not saying it wasn't notarized on that date or isn't my signature.'

"51. On November 14, 2008, the Respondent filed a corrected motion for emergency hearing on changed circumstances to hold defendants in contempt and for injunctive relief.

"52. On November 20, 2008, it became necessary for the Court to move the hearing from 2:30 p.m. that day to 1:00 p.m. that day. The Court's assistant contacted the Respondent and Mr. Rank. The Court's assistant learned that the Respondent failed to provide notice as required by K.S.A. 60-206(b) to Mr. Rank. Mr. Rank informed the Court's assistant that neither he nor his clients were available for the hearing at the scheduled time. The Court requested that Mr. Rank and the Bluhms appear by telephone.

"53. On November 20, 200[8], Mr. Rank filed an objection to the Respondent's notice of hearing regarding the corrected motion for emergency hearing.

"54. That same day, the Court held a hearing on Ms. Friedheim's motion. The Respondent and Ms. Friedheim appeared in person. The Bluhms and their counsel appeared by telephone. The Court concluded that the Respondent failed to give the Bluhms and their counsel proper notice of the hearing. However, during the hearing, Mr. Rank informed the Court that the Bluhms intended to move from Ms. Friedheim's residence. In light of the Bluhms' stated intention, the Court ordered the Bluhms to vacate Ms. Friedheim's home by November 30, 2008, at 5:00 p.m.

"55. On December 8, 2008, the Respondent sent Ms. Friedheim an electronic mail message, making clear that she needed to make arrangements to pay his bill.

"56. On December 11, 2008, the Respondent wrote to Mrs. Friedheim detailing theories for suit against the Bluhms and requesting that she make arrangements to pay the legal fees incurred to date.

"57. On December 28, 2008, the Respondent filed an attorney lien with the Bluhms and Mr. Rank, making claim for the unpaid monies under the lease agreement.

"58. On January 12, 2009, the Respondent filed a motion for leave to withdraw from the representation of Mrs. Friedheim. In the motion, the Respondent did not relate any reasons for the requested withdrawal. On January 30, 2009, the Court allowed the Respondent to withdraw.

"59. On February 12, 2009, the Respondent made a claim with Ms. Friedheim's homeowner's insurance. The Respondent sent Ms. Friedheim a copy of the letter and also sent Ms. Friedheim an additional demand for her to pay her outstanding attorneys fees.

"60. On April 30, 2009, the Respondent wrote to Lewanna Bell-Lloyd, Ms. Friedheim's attorney in another matter relating to her home. The Respondent's letter provided as follows:

'I am writing you in an attempt to avoid having to sue Mrs. Friedheim. Though it is not my preference to sue her, or to have to testify in such a suit, especially as the fact that foreclosure of a judgment against the Leawood property is appropriate, I will do so rather than lose over $32,000 by her fraud and dishonesty and breaches of contract.

'I represented Mary Friedheim with respect to claims arising from her rental of her Leawood south house to the Bluhms and did a very good job for her. The Johnson County District Court record indicates that you are her attorney with respect to her mortgage litigation. This letter concerns what will shortly be a judgment lien and foreclosure against the Leawood property which may be relevant to your litigation with USBank and the IRS. I prefer to not institute the litigation if at all possible.

'These facts can be gleaned from the public record. Mrs. Friedheim leased her home to the Bluhms last August. The Bluhms then commenced destruction and damage to the improvements, refused to pay their rent, and according to Mary commenced stealing and selling her property. In an unprecedented move I was able to persuade the court to enter injunctive relief and extricate the Bluhm's [sic] in a fairly swift manner. Mary was ecstatic. The Bluhms then ex parted [sic] the court and were restored to the house based upon apparent assertions that she was a dangerous and threatening person and made a point of mentioning at trial that she was a convicted felon, that they operated a business in her home which she failed to disclose and otherwise. The court's behavior was quite extraordinary. Prior to the hearing, the judge came into the witness room to inform us that we were being physically segregated because of allegations made by the Bluhms. He also called in the Sheriff to watch the door and keep the peace. I found this quite strange but when Mr. Getters [sic], Mrs. Friedheim's boyfriend, arrived it became obvious that there was animosity and open hostility between Mr. Getters [sic] and Mr. Bluhm and the court reprimanded the two of them to not even look at one and the other.

'At that point very extensive work was required to persuade the court and the Bluhm's [sic] that Mrs. Friedheim should be restored to her property. This work included motion practice and extensive research and drafting and editing of a Writ/Appeal. The necessity for this was what Mrs. Friedheim characterized as ongoing theft of [sic] destruction to her property for which she had no adequate legal remedy, and difficulty occasioned by the Bluhms ex parte contact with the court. She characterized the house as being of a value of $1,000,000 and the personalty as in excess of $500,000.00. These representations as to her resources are now believed to have been false. As Mr. Bluhm testified there was little of value in her "antiques" that her auctioneer declined to take items to sale a [sic] lacking in value, and she apparently has no equity in the realty based upon the recorded lien interests.

'I understand that there is a foreclosure action pending to be tried in October from a recent docket entry in the case in which you represent Mrs. Friedheim. I would think you would be very careful in advancing a homestead defense which would be contrary to fact and law.

'Mrs. Friedheim engaged in fraud to steal over $32,000 in professional services from me by deceit. She pledge [*sic*] an art glass lamp she represented to be of a value of $20,000 the actual value of which is substantially less than $2,000, [*sic*] she represented that she was an antique dealer at the Mission Antique Mall. She represented she had a job and would be making payments, and that she was selling antiques to raise money, that she would pledge additional antiques/art to secure her obligation. She represented that her boyfriend pays her bills and would be helping her pay for her representation. She failed to perform any of her promises, though a trip to the Mission Road Antique Mall confirmed that she was engaged there as an antique dealer.

'I had known her husband from his managerial days at Channel 62 in the 1980's and knew her through a mutual acquaintance who referred her to my office. She made other representations to me that gave me comfort in commencing and continuing to work for her. Fortunately for her, I restored her to her home and personal property and stopped the damage from accruing. Mr. Bluhm had cut down her trees, taken down her gates, interfered with her wiring, damaged and destroyed her property, his dogs and cat had fouled the house, he was ordered to stop sleeping on her linens in her bed, to stop using her personal property as his own. She recovered possession.

'In reliance upon her representation work was performed. Once I recovered her home and belongings for her, she then enlisted her boyfriend to attempt to strong arm my office for documents we obviously could not release to him without her written signature.

'In six months since hiring this office and four months since work was completed she has paid this office nothing. ***She has not paid one penny and refused even to discuss her bill other than to acknowledge she owes it.*** Payment is necessary to avoid legal action.

'I have offered to reduce our bill, to accept substitute and additional collateral, to accept payments, and to see whatever other arrangement she may believe reasonable. For the last five months she has refused to respond with any payment or suggestion. I might add that she represented her boyfriend would help her pay the bill and he stated he would do so but also has not paid a dime. I cannot forebear collection any longer.

'I am going to hire an attorney, sue Mrs. Friedheim and her boyfriend on the account and if my lawyer so advises also for fraud, and her boyfriend for assault and false imprisonment as the intentional tort claims are non-dischargeable. When a judgment is entered I will foreclose the judgment lien against the house as it is not exempt under homestead, and then I would expect the mortgage companies will bid their interest and I will then

be paid in full and that will be the end of the litigation except as to any deficiencies.

'I will also tell you this. Mrs. Friedheim has a habit and practice of utilizing Mr. Getters [sic] and others as a "tough guy" to threaten and intimidate. She did that with Mr. Bluhm, and she also did that to me. Mr. Bluhm apparently exparte'd [sic] the court about her conduct which resulted in the court dissolving the injunction. If she sends anyone, whether Mr. Getters [sic] who was advised to leave the office before the police would be called and never to return to my office, her north town Realtor whom she utilized to intimidate the Bluhms, or anyone else, around me again to act in a "tough" manner I will not hesitate to contact the police.

'Please call me to discuss payment arrangements. If this matter is not worked out I will have my attorney file suit and a lis pendens, proceed to judgment and foreclose the judgment lien or sell it to any of the mortgagees before the trial in your case.'

"61. On June 23, 2009, a collection attorney sent a letter to Ms. Friedheim in an attempt to collect the Respondent's unpaid attorneys fees.

"62. On August 12, 2009, the Respondent filed suit against Ms. Friedheim in an attempt to collect the unpaid attorneys fees in the Johnson County District Court, styled *Small v. Friedheim*, case number 09CV07311.

"63. On August 25, 2009, Ms. Friedheim filed a complaint against the Respondent. Ms. Pearman investigated the complaint.

"64. On February 3, 2011, the Johnson County District Court in *Small v. Friedheim*, denied the Respondent's motion to continue the trial and granted the Respondent's motion to dismiss, at Respondent's cost.

"65. After Ms. Pearman completed the investigation of Ms. Friedheim's disciplinary complaint, the Deputy Disciplinary Administrator informed the Respondent that he was eligible for the attorney diversion program. The Respondent declined to accept the terms of the diversion program.

"66. On August 24, 2011, the Deputy Disciplinary Administrator filed the formal complaint in the instant case. In the formal complaint, the Deputy Disciplinary Administrator alleged that the Respondent violated KRPC 1.5, KRPC 1.6, and KRPC 8.4.

"67. KRPC 1.5 provides as follows:

'(a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

'(b) When the lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation.

'(c) A lawyer's fee shall be reasonable but a court determination that a fee is not reasonable shall not be presumptive evidence of a violation that requires discipline of the attorney.

'(d) A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by paragraph (f) or other law. A contingent fee agreement shall be in writing and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal, and the litigation and other expenses to be deducted from the recovery. All such expenses shall be deducted before the contingent fee is calculated. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter and, if there is a recovery, showing the client's share and amount and the method of its determination. The statement shall advise the client of the right to have the fee reviewed as provided in subsection (e).

'(e) Upon application by the client, all fee contracts shall be subject to review and approval by the appropriate court having jurisdiction of the matter and the court shall have the authority to determine whether the contract is reasonable. If the court finds the contract is not reasonable, it shall set and allow a reasonable fee.

'(f) A lawyer shall not enter into an arrangement for, charge, or collect:

(1) Any fee in a domestic relations matter, the payment or amount of which is contingent upon the securing of a divorce or upon the amount of alimony, support, or property settlement; or

(2) a contingent fee for representing a defendant in a criminal case; or

(3) a contingent fee in any other matter in which such a fee is precluded by statute.

'(g) A division of fee, which may include a portion designated for referral of a matter, between or among lawyers who are not in the same firm may be made if the total fee is reasonable and the client is advised of and does not object to the division.

'(h) This rule does not prohibit payments to former partners or associates or their estates pursuant to a separation or retirement agreement.'

"68. The Deputy Disciplinary Administrator argued that billing more than $32,000 for the representation was unreasonable. She also argued that having one billing rate for day time hours and another billing rate for after hours when the Respondent appears to work more after regular business hours is also unreasonable.

"69. The Hearing Panel rejects that argument that billing more than $32,000 for the representation was unreasonable. Ms. Friedheim was a demanding client with an urgent need for quick action. While the Respondent's chosen method of representing Ms. Friedheim was unconventional and not initially effective, the Respondent appears to have worked the hours and performed the work he billed for.

"70. Regarding the Respondent's billing rates, it is not the Hearing Panel's purview in hearing attorney disciplinary cases to ensure that clients negotiate low hourly rates. While the Respondent's attorney fee rate may not have been a good deal, the Hearing Panel is unable to conclude, by clear and convincing evidence, that the Respondent's fee in this regard was unreasonable.

"71. In reviewing the Respondent's billing records, it is clear that the Respondent bills his clients in one-quarter increments. Clearly, it would be highly unlikely for each episode of the Respondent's work on this case to have occurred in quarter hour increments.

"72. In *In re Scimeca*, 265 Kan. 742 (1998), the Respondent engaged in the same billing practice. There, the Court stated:

'We agree . . . that billing for quarter hours is not a violation if that time is spent on a client's business. The violation is in not spending the time billed to the client on the client's business. Here, respondent clearly billed for time not spent in representing the client. He concedes that his billing practices were improper, and although he claims it was done in ignorance, it is nevertheless a violation of the MRPC.'

"73. At the formal hearing, in his opening statement, the Respondent stated:

'. . . And I endeavor to give value for the time I charge my clients. In other words, they get time they're not charged for, I don't sit down and say I'm going to round up an hour or half hour or quarter hour. There may be minutes rounded, a matter of two or three minutes rounded or maybe rounded down to zero, but it's not a question of adding a quarter hour to every charge and it's— it's—that's—it's a fiction, there's no evidence of that.'

Additionally, the Respondent testified as follows regarding his quarter hour billing:

'MR. SMALL: . . . Now, I understood from the opening statement there's an issue in Kansas about quarter hour billings. The bill that I sent her, and I have the work in progress report for the overall bill, the final bill as well. The final bill, work in progress report shows 17 and a half hours written off of the bill. In other words, 17 and a half hours of time that were expended but not charged at all and there are 40 actual entries. Now, if one were to be cynical and say, well, you billed a quarter of an hour too much, the last quarter of an hour on each time entry you shouldn't have billed, that would be 10 hours. So to the extent there is a concern that Mrs. Friedheim may have been overcharged for 10 hours, you see this, and I'll mark it as 49, this overall progress report, you'll see that actually there was more than a quarter hour taken off on average from every entry, not time added onto it. Well, there maybe, and I don't know what the case was or what the case is, but the fact of the matter is, I think what it should be boiled down to is, did the lawyer spend the time for which he charged. I'm sorry?

'CHAIRMAN SHARP: I don't think there was any question.

'MR. SMALL: Okay. I think the question should be did this guy really spend 100 hours working on this case, number one, or did he really spend 90 hours and charge for 100 hours because the increments and that's not the case here. There wasn't an inflation. There was a deflation. As I said, I don't want to overcharge a client. You know, happy clients send you more clients, an unhappy client makes you worry if you're going to wake up tomorrow. So I think that that's one part of the bill issue.'

The Hearing Panel was not presented with clear and convincing evidence that the Respondent billed for time not provided, thus, the Hearing Panel does not conclude that the Respondent violated KRPC 1.5 in this regard.

"74. Accordingly, the Hearing Panel concludes that the clear and convincing evidence was not provided to establish that the Respondent violated KRPC 1.5.

"75. KRPC 1.6 provides:

'(a) A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraph (b).

'(b) A lawyer may reveal such information to the extent the lawyer reasonably believes necessary:

(1) To prevent the client from committing a crime; or

(2) to comply with requirements of law or orders of any tribunal; or

(3) to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, to establish a defense to a criminal charge or civil claim against the lawyer based upon conduct in which the client was involved, or to respond to allegations in any proceeding concerning the lawyer's representation of the client.'

"76. In a similar case, *In re Bryan*, 275 Kan. 202 (2003)[Footnote: Ironically, the Respondent was involved in Mr. Bryan's case.], the Court found a violation of KRPC 1.6 when the Respondent sent a letter to his client's subsequent attorney. After Mr. Bryan terminated the attorney-client relationship and after the client retained subsequent counsel, Mr. Bryan sent the new attorney a letter which contained the following paragraphs:

'The point of this letter is to tell you that I may have to defend myself against your client's accusations by making public certain things I know about her which will damage her credibility in the extreme. I have never discussed them with you, or Rachelle, because I was trying to get out of representing her without needlessly hurting her sister's feelings or damaging Helene's reputation, but I can't do that now. I fired your client in March of 1998, but I never told you why. Attached is the termination letter from my office to your client, explaining the reasons why I felt I had to fire Helene. There are other good reasons which I did not put in the letter, but also are extremely damaging to her credibility and admissible in court. If I have to respond to any allegations made against me by Helene, the things in that letter are going to have to go public, which means they will be in the possession of the attorneys for Stephen Small. . . . I can't think of any reason why I shouldn't sue Helene for defamation and put a stop to this, except that her case and Marla Worthington's are consolidated and that might hurt my client too. That's the problem.

'You need to tell Helene to shut her mouth, because if she doesn't she's going to destroy her own case against Steve Small, and maybe Marla Worthington's case too. I will, of course, move the court to "unconsolidate" the cases based upon this conflict, and I will then explain to the Court and Jay Barton that Ms. Eichenwald has now accused me of stalking her at her place of employment. This will immediately tip the other side that something good is there for Steve Small, and I can be deposed about it since I was not her counsel at the time of the incident.'

Additionally, Mr. Bryan sent a letter to his former client's employer. That letter included the following:

'Additionally, I happen to know that Ms. Eichenwald has a history of making false claims such as those she is making against me, and this will all come out in court. During the seven years that I have known Ms. Eichenwald, there has rarely been a period of time when she didn't claim that someone was after her, following her, or stalking her. One particularly telling example of this trait is a police report Ms. Eichenwald filed with the Prairie Village Police Department in 1996. In this police report, Ms. Eichenwald seriously claimed that while she was away from home, some man must have stood at her front door and masturbated on her front door window, in front of passing traffic and four feet off the ground. The police officer and I both tried to tell her that this was impossible and ridiculous, but she insisted that this was what happened. Claims like these make Ms. Eichenwald feel important because they increase concern for her among others, and get her

more attention. Ms. Eichenwald likes that very much, and does whatever she can to insure it continues. Believe me, there is not now, nor has there ever been, anyone stalking or harassing Ms. Eichenwald.'

"77. The Hearing Panel, in *In re Bryan*, thoroughly analyzed Mr. Bryan's statements. The Hearing Panel, in that case, concluded as follows:

'8. First, the disclosures were not made to establish a claim or defense in any civil or criminal case. At the time the Respondent made the disclosures to Mr. Grissom, there was no pending action between the Respondent and Ms. Eichenwald.

'9. Second, the disclosures were not made to respond to allegations in any proceeding. Certainly, at the hearing on this matter, the Respondent argued that the disclosures were made in response to allegations made by Ms. Eichenwald and in an attempt to protect his reputation in the legal community. However, there was no "proceeding" as required by KRPC 1.6(b). The disclosures were simply made to embarrass Ms. Eichenwald before her new attorney.

'10. Because the disclosures made to Mr. Grissom were not necessary to establish a claim or defense or to respond to allegations in any proceeding, the Hearing Panel concludes that the Respondent revealed information relating to the representation of Ms. Eichenwald in violation of KRPC 1.6(a).

'*Letter of September 11, 1999, to Kris Allen and Jennifer Knipp*

'11.On September 11, 1999, the Respondent wrote a letter to Nordstrom store manager Kris Allen and Nordstrom Loss Prevention Manager Jennifer Knipp. Including a specific example, the Respondent disclosed to Mr. Allen and Ms. Knipp that [Ms. Eichenwald] has a history of making false claims and accusations of stalking.

'12. The Respondent's disclosure that Ms. Eichenwald has a history of making false claims amounts to revealing information relating to the representation of Ms. Eichenwald. And, because the disclosures were not authorized by KRPC 1.6(b), the Hearing Panel concludes that the Respondent violated KRPC 1.6(a).'

"78. The Court, in *In re Bryan*, upheld the Hearing Panel's conclusions, as follows:

'In reviewing the conclusions of law of the panel, it is difficult to conclude that Bryan's disclosures to Grissom and the Nordstrom employees were reasonable; therefore, they constituted violations of KRPC 1.6. We note that the panel relied upon the erroneous belief that a formal proceeding was necessary before disclosures in self-defense could be made under KRPC 1.6. Under the circumstances, however, the disclosures to both Grissom and the Nordstrom employees exceeded that which was reasonably necessary for him to defend against Eichenwald's allegations.'

"79. In this case, the Respondent, like Mr. Bryan, wrote a letter to subsequent counsel that was not necessary. However, the statements in the Respondent's letter did not go as far as the statements in Mr. Bryan's letters. Accordingly, the Hearing Panel concludes that while the Respondent's letter to Ms. Bell-Lloyd was not necessary, it does not constitute clear and convincing evidence that the Respondent violated KRPC 1.6.

"80. KRPC 8.4 defines professional misconduct in a number of different ways. According to KRPC 8.4(d), '[i]t is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice.' KRPC 8.4(g) provides that '[i]t is professional misconduct for a lawyer to . . . engage in any other conduct that adversely reflects on the lawyer's fitness to practice law.'

"81. The Respondent violated KRPC 8.4(d) and KRPC 8.4(g) before and during the disciplinary process. The Respondent used threats and intimidation tactics against Mr. Rank, Judge Sutherland, the attorney investigator, and the Deputy Disciplinary Administrator. Further, during the disciplinary hearing, the Respondent attempted to intimidate Ms. Friedheim.

"82. The Respondent's principal litigation tactic seems to be to make threats, utilize intimidation tactics, and blame everyone else in the litigation process from opposing counsel to the judge. The Hearing Panel provides the following as examples of the Respondent's misconduct in this regard:

"83. On October 28, 2008, the Respondent sent an electronic mail message to Judge Sutherland, stating in material part:

'I request that the court consider this a further emergency request that the court stay the modification of the order until further order of the court. What is developing is retaliatory tactic by the defendants by commencing malicious and false allegations against the plaintiff to the police, though I don't know the statute, I am certain that this is a crime to behave in such a manner. Surely the court did not intend to create such an opportunity. [sic]'

"84. On October 28, 2008, the Respondent filed a motion to reconsider and vacate the order of October 27, 2008, 'reseizing defendants of realty and motion for disqualification or recusal.' The Respondent suggested in paragraph 13 that the Court had violated the Kansas Code of Judicial Conduct. The Respondent made specific allegations of misconduct against the judge. For example, the Respondent stated:

'The Plaintiff cannot have confidence in this court given the court's fear of being burned and then adjudicating the proceedings based upon a fear of granting relief requested and the court determine necessary under the facts and law. The Defendants did not present any evidence to controvert the verified Application for relief, and the Plaintiff's evidence should have lead [sic] the court to make the relief permanent. This is not to say that the Plaintiff would lack confidence as to a mere error at law or other appealable issue, but the court's personal feelings about the circumstances, fear of

being burned, is something which would indicate personal interest in the outcome or how the court's ruling would be viewed, and such should have no bearing in a fair disposition of litigation.

. . . .

'The court lacked impartiality in advocating, indeed conduct [sic] legal research to subtrovert its own grant of injunctive relief. . . .

. . . .

'The court was improperly prejudiced by the Defendants. When Plaintiff inquired what else the Defendants said, the court hostilely indicated nothing; however, it appears that the court was unaware of the prejudice whatever the Defendants may have said as evidence by the sequestering of the parties and the hostility of the court toward the Plaintiff.

'. . . The court improperly expended its efforts to advocate the law on behalf of the Defendants, and then did so relying on two federal decisions, rather than the law presented and the evidence presented. In acting as the Defendants [sic] counsel the court's judgment was not a product of impartiality.

. . . .

'. . . Plaintiffs [sic] felt harassed by the court on the following grounds: (1) the court's expression of suspicion of Plaintiff's class of claim; (2) the court's fear of being "burned" if relief were granted; (3) the need for rules of engagement and (4) the command of sequestration of the parties; (5) the court's screaming at counsel twice, the first "NO" at the bench, and the second denying any other ex parte statements were considered. [sic] (5) the intimidating, hostile and threatening telephone message. Whether or not this animus was precipitated by any cause enumerated specifically in the Cannon [sic] the effects of the screaming, hostility, distrust, denigration, segregation, etc. were in fact harassment just as improper. . . .

. . . .

'The demeaning, harassing, hostile attitude engendered by the Defendants ex parte communication *required* disqualification, as did the court's fear of reprisal or being burned by granting injunctive relief at the outset. Further, the court's hyper-vigilance engendered by the Defendants which precipitated comments such as the emotions running high, etc., evidence the court was persuaded through the ex parte communications that the Defendants were victimized by the Order. Finally, it was humiliating to be screamed at by the court. If the court had animus against a party, the court should recuse itself.'

"85. On November 2, 2008, the Respondent sent an electronic mail message to Mr. Rank, stating:

'In the event your clients do not leave we will file our mandamus action in the Supreme Court and you can then explain why you mislead [sic] Judge

Sutherland, as well as the full extent of any ex parte contact by yourself and your clients.'

"86. On November 5, 2008, the Respondent sent another electronic mail message to Mr. Rank, stating:

'. . . Furthermore, the court believed and still does that your client acted wrongfully toward her property, and your client admitted stealing and damaging it. Your client admitted so, which of course may give rise to a malpractice claim against you. Your client has no claims against either me or my client, and if he pursues such claims they will be viewed as defamatory and a matter of malicious prosecution for which the clients and all participating lawyers will be sued. While your clients may not have any money, you should, and we'll be happy to pursue you to collect it.'

"87. On November 13, 2008, the Respondent sent yet another electronic mail message. The Respondent stated:

'The substantial ongoing increase in legal expense is something we have requested that the court tax jointly and severally to you and your clients as it has and would otherwise have been avoidable. Additionally, given the Bluhm's [sic] threats it will be necessary to proceed in Mandamus for the injunctive relief if it is not granted in the district court. Your clients can stop the accrual of that expense by complying with demand that they arrange to immediately vacate. If they are not removed by the court by noon tomorrow a mandamus [sic] action will be filed. . . .

'You should not assist your clients' perpetuation of criminal (false statements to the police, theft, malicious destruction of property, stealing utilities, trespass), fraudulent and tortuous acts (conversion, interference, defamation, etc.). Given the history and Bluhms [sic] intent to continue to act improperly, you are ethically obligated to withdraw if you cannot bring them within the law. There is no attorney client privilege in assisting or furthering the criminal or fraudulent acts of a client, and in fact there is joint civil, and criminal liability to the extent you do so. I cannot imagine any client is worth those exposures, or misrepresenting to the court the client would peaceably vacate shortly, but perhaps you view life and the practice differently.'

"88. On March 22, 2011, the Respondent sent the Deputy Disciplinary Administrator an electronic mail message. In the electronic mail message, the Respondent accused Ms. Pearman of wrongdoing.

'In reading Kansas Supreme Court disciplinary decisions it is apparent the court is very considerate in deliberating these matters; however, the court also apparently adopts findings of fact and conclusions of law resulting from the investigative process and ensuing panel hearing, and may adopt recommendations of the panel and of your office. . . . The court's reliance is of importance because where the underlying investigative report is flawed, the product of bias, interest, prejudice or otherwise amounts to a

due process violation, substantial prejudice and injustice will result commencing with the docketing of the report, and the exposure of the attorney to public scrutiny unfairly where the allegations are unsustainable. . . . I am not suggesting that your office should not take appropriate action, what I am suggesting based in part on what is mentioned herein, is that [sic] is premature to take action other than (a) permitting a comprehensive response for further consideration and if it is still believed that there are remaining issues (b) for re-assignment of an investigator at this time given the prejudicially flawed investigative report.

'In this case the investigative findings are contradicted by file material not referenced by the Investigator. The material is substantial, credible and includes written statements and admissions of Mrs. Friedheim which contradict her positions taken in her complaint with the investigator [sic]. There are also some serious misstatements by the investigator in the report.

. . . .

'. . . .These are but a few examples showing how and why the conclusions reached by the investigator are colored rather than neutral and the conclusions are felt to be unfounded.

. . . .

'. . . As such the investigative report is materially false with respect to a significant factor, and that is the availability mitigation. Given this proceeding is having a substantial impact on me personally, and may professionally and reputationally, I believe that there is a question of fairness and impartiality and bias raised by the investigator's false statements concerning non-cooperation.'

"89.  During the disciplinary proceedings, the Deputy Disciplinary Administrator and the Respondent deposed Ms. Pearman, on November 2, 2011, and November 7, 2011. During the first day of the deposition, the Respondent accused Ms. Pearman of including false statements in her investigative report, in violation of KRPC 3.3.

'MR. SMALL: Well, I would just—as we discussed, I have some concerns under Rule 3.3 and some related rules that there are some matters that were perhaps innocently included in the investigative report at the time based upon the information available which may subsequently have been learned on further investigation or on notice not to be as they appeared initially. And I just want to make sure that to the extent there's some issues arising from falsehoods uttered by Mrs. Friedheim that my position is that the record should be purged of those false statements.

'MS. KNOLL: Okay. And like I said and like we talked on the phone, that is something that needs to be brought up in a motion to the panel. The purpose—the scope of the order for today is to depose Ms. Pearman, not to argue whether or not there's probable cause, not to argue if there's been a violation of 3.3, not to argue any of those things.

'MR. SMALL: I'm not suggesting there's a violation of 3.3. What I'm saying is that I think our obligation as lawyers under 3.3, 3.4, 8.3, and 4, 1.2(d) is not to inject information or evidence, testimony, and exhibits which we learn are not true into a proceeding because that would be detrimental to the integrity of the process itself. And in the context of probable cause determinations, if already there are some erroneous statements in the record and the exhibits that have been filed then I think there is a duty under 3.3 to take remedial action to preserve the integrity of the proceeding. That's my concern. And that I think the rules that—and, I mean, I think the rules that—that are implicated in that and I'm not accusing anyone of violating any rules or intending to violate any rules or knowingly saying they're injecting anything that they believed was false. I'm not saying that. It is the respondent's contention that Mrs. Friedheim is engaged in a gross course of misconduct and misrepresentation about a number of things starting with line one on her complaint where she said she traded a lamp.

. . . .

'Q. [By the Deputy Disciplinary Administrator] So this is what you were talking about that you were discussing with him?

'A. [By Ms. Pearman] Right. In fact, there was—you know, there was a great deal of time early on with Ms. Friedheim sitting there and she expressed to me being physically exhausted and having to sit there all night while he took numerous breaks to go outside and smoke cigarettes and keeping her there all night. I thought that was an unusual scenario. I don't see that—plus the extra charge for that of $100 an hour more.

And I found it unusual that subsequent to the TRO being entered on a Saturday he showed up at her house. And I don't know that he was requested to be there. Showed up with his dogs. I thought that was unusual. And according to what I was told by him, as well as others, began going through records that belongs to the Blooms [*sic*], in fact. Getting into their filing cabinets because they had at this point—

'MR. SMALL: I have to object to all of this as hearsay and hearing on hearsay, in addition to being very likely in violation of Rule 3.3. There is no—you did not witness—and my objection is you did not witness me going through anybody's property at any time, did you ma'am?'

After the first day of the deposition, the Deputy Disciplinary Administrator filed a motion regarding difficulties that developed during the deposition.

"90. The next day, November 4, 2011, the Respondent filed a 24 page response to the motion. In his response, the Respondent asserted:

'6.) Paragraph 22 of the Formal Complaint (Corrected) continues:

On February 3, 2011 Complainant's pro se Motion to Dismiss was granted. The case filed by Respondent against Complainant for fees was dismissed.

'Respondent informed the Deputy Disciplinary Administrator that the assertion set forth in the Formal Complaint and the Formal Complaint (Corrected) set forth at paragraph 22 is factually inaccurate. Rather [sic] agree to withdraw the allegation, the Deputy Disciplinary Administrator responded that the issue should be taken up at the hearing. Due to Jayne Pearman's unavailability for the hearing a deposition was set for November 2, 2011. Rule 3.3 requires the Disciplinary Administrator to purge this action of facts and allegations known to be false, to refrain from calling witnesses who would commit perjury such as Mrs. Friedheim, and to correct the misapprehensions of the tribunal with respect to any and all false accusations and evidence. [sic]

. . . .

'B.) Respondent requests the Disciplinary Administrator be admonished to refrain from eliciting hearsay, speculation or conjecture by Ms. Pearman or any other witness.

'C.) Respondent requests that the Disciplinary Administrator be order [sic] to take such remedial action as is required pursuant to Rule 3.3 with respect to the complaint, her exhibits, and otherwise in all regards.

'D.) Respondent requests that the Disciplinary Administrator be reminded that Rule 226 in its entirety applies to her and her attorney witnesses as does abiding by the Orders entered by the Panel.'

"91. The Hearing Panel concludes that the Respondent's use of threats and intimidation tactics with respect to Mr. Rank, Judge Sutherland, Ms. Pearman, and the Deputy Disciplinary Administrator resulted in prejudice to the administration of justice and, additionally, adversely reflects on the Respondent's fitness to practice law. As such, the Hearing Panel concludes that the Respondent repeatedly violated KRPC 8.4(d) and KRPC 8.4(g) in this regard.

"92. The Respondent's practice with regard to notarizing documents is troubling to the Hearing Panel. The Respondent testified that when he seeks to have his signature notarized by Mr. Nigro, he does not take the finished document to Mr. Nigro, swear to the truth of the contents of the document, and then sign the document. Rather, the Respondent simply provides Mr. Nigro with a signature page, signed by the Respondent, and requests that Mr. Nigro notarize the signature.

"93. Pursuant to K.S.A. 53-107,

'Notaries shall have authority to (1) Take acknowledgments; (2) administer oaths and affirmations; (3) take a verification upon oath or affirmation; (4) witness or attest a signature; (5) certify or attest a copy; (6) note a protest of a negotiable instrument; and (7) perform any other act permitted by law.'

"94. In this case, Mr. Nigro notarized the Respondent's signature, stating:

'Before me, a Notary Public, for said county and state, personally appeared Stephen B. Small, known to me to be the person who executed the

foregoing on this 14th of November, 2008 stating the foregoing is true to the best of his knowledge and belief.'

However, the Respondent failed to provide Mr. Nigro with the 'foregoing.' The Respondent simply took the signature page, notarized by Mr. Nigro, and attached it to the affidavit after the affidavit was complete.

"95. The Respondent's conduct undermines the purpose of having a document notarized, is prejudicial to the administration of justice, and reflects adversely on his fitness to practice law. As such, the Hearing Panel concludes that the Respondent again violated KRPC 8.4(d) and KRPC 8.4(g).

"96. Next, on April 30, 2009, the Respondent wrote to Ms. Bell-Lloyd, Ms. Friedheim's attorney in a different action. The Respondent's letter was not a demand letter, but rather a personal attack against Ms. Friedheim. The issuance of the Respondent's letter to Ms. Bell-Lloyd was prejudicial to the administration of justice and adversely reflects on the Respondent's fitness to practice law. Thus, the Hearing Panel concludes that the Respondent violated KRPC 8.4(d) and KRPC 8.4(g) by sending the letter to Ms. Bell-Lloyd.

"97. Finally, the Respondent's cross-examination of Ms. Friedheim was permeated with personal and unprofessional questions apparently intended to be more confrontational and combative than designed to elicit information and responses favorable to the Respondent.

"98. There were serious issues concerning the credibility of Ms. Friedheim who had been charged with five felony counts of identity theft in Johnson County District Court and in a plea agreement pled guilty to one felony count. Court records of Ms. Friedheim's charges and guilty plea to felony identity theft were admitted into evidence, so with little difficulty the Respondent could have effectively and totally undermined Ms. Friedheim's credibility.

"99. Instead, Respondent chose to be confrontational, to digress into irrelevant facts, to argue with the witness, and to repeat the same questions over and over again. The net result of the Respondent's two hour battering of Ms. Friedheim on cross-examination was to evoke sympathy for her and to focus attention away from her demonstrable questionable credibility.

"100. The Respondent's cross-examination of Ms. Friedheim was not as excessive or egregious as the punitive examination before the Court in *State v. Phelps*, 226 Kan. 371 (1979). Nevertheless as was the situation in *Phelps*, the Respondent appeared to be more interested in personally punishing the witness than in attacking her credibility, and much of what the Supreme Court had to say in *Phelps* is applicable here:

'He called the defendant, Carolene Brady, as his witness, had her declared hostile, then proceeded to cross-examine her for 3 or 4 full days. The record discloses that his cross-examination was abusive, repetitive, irrelevant, and represented a classic case of "badgering" a witness.' *Phelps*, 226 Kan. at 373.

"101. Much of the Respondent's cross-examination of Ms. Friedheim consisted of the reading of passages from documents already admitted into evidence, lengthy

recitations of facts and comments without any question, and arguments that Ms. Friedheim's oral testimony contradicted previous statements on minor issues when it really did not.

"102. This disreputable tactic has been prohibited by our Supreme Court since its decision in *Mesecher v. Cropp*, 213 Kan. 695 (1974), which held as follows:

'At that point counsel set out to impeach her by reading questions and answers from her deposition. Plaintiffs' counsel soon objected, but was overruled. There followed a reading of questions and answers from the deposition, consuming six pages in the record, without any pretense of a question to the witness on the stand, until finally the trial court intervened:

"THE COURT: Mr. Turner, I am about to stop your examination of this witness on her deposition. As I would understand it, the proper province is to examine her on testimony given here today, and you are basically limited to that. You can go into her deposition if there is a conflict between her testimony and her deposition, but we are just going on and on here in areas where it appears to me the deposition is completely consistent with the essence of the testimony given today."

'The trial court obviously thought at this point that such use of a deposition in a purported cross-examination was improper, and we agree.

'Counsel is entitled to impeach any witness by showing prior inconsistent statements, and where they are contained in a deposition he may cross-examine the witness about the deposition. Additionally, as pointed out in the discussion above, he is also entitled to use the deposition of a party as substantive evidence, by reading into evidence the admissions contained therein as part of his case-in-chief. Here the court found no inconsistent statements in Mrs. Mesecher's deposition; hence the proper method of using the deposition was for the defendants to introduce it during their case-in-chief. The course actually employed undoubtedly gave the impression to the jury that, at least in counsel's view, the witness was lying. Where successful, and where the witness is a party, such tactics can be devastating.

'In the post-trial proceedings it was this tactic which the trial judge raised on his own motion as possibly constituting "misconduct of counsel." ' *Mesecher*, 213 Kan. at 699-700.

"103. The Hearing Panel concludes that the Respondent's cross-examination also resulted in prejudice to the administration of justice and adversely reflects on his fitness to practice law. Accordingly, the Hearing Panel concludes that the Respondent violated KRPC 8.4(d) and KRPC 8.4(g) in his cross-examination of Ms. Friedheim at the formal hearing.

"American Bar Association
"Standards for Imposing Law Sanctions

"104. In making this recommendation for discipline, the Hearing Panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards' "). Pursuant to Standard 3,

the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"105. *Duty Violated.* The Respondent violated his duty to the public and to the legal profession to maintain his personal integrity.

"106. *Mental State.* The Respondent knowingly violated his duties.

"107. *Injury.* As a result of the Respondent's misconduct, the Respondent caused actual or potential injury to his client, the legal system, and the legal profession.

"108. *Aggravating or Mitigating Factors.* Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following aggravating factors present:

"109. *Dishonest or Selfish Motive.* The Respondent's misconduct in this case was selfish. Rather than professionally representing his client and, later, himself, the Respondent engaged in personal attacks on Mr. Rank, Judge Sutherland, the attorney investigator, the Deputy Disciplinary Administrator, and Ms. Friedheim. The Respondent's selfish approach to the representation of Ms. Friedheim and himself is an aggravating factor in this case.

"110. *A Pattern of Misconduct.* The Respondent engaged in a pattern of misconduct. The Respondent's pattern includes personal attacks on those who disagree with his opinion of evidence or other matters. Specifically, in the underlying case and in the disciplinary case, the Respondent attacked Mr. Rank, Judge Sutherland, the attorney investigator, the Deputy Disciplinary Administrator, and Ms. Friedheim.

"111. In the pleadings and the written correspondence in the underlying litigation, the Respondent was repeatedly abusive to Mr. Rank. The Respondent attacked Judge Sutherland for ruling against him and asserted that Judge Sutherland's ruling was biased. The Respondent attacked Ms. Pearman's statements in her investigative report, alleging that KRPC 3.3 required the deletion of certain statements. The Respondent attacked the Deputy Disciplinary Administrator in his response to the Deputy Disciplinary Administrator's motion regarding Ms. Pearman's deposition and requested that she be reminded that the Kansas Rules of Professional Conduct apply to her and to her attorney witnesses. Additionally, the Respondent attacked the Deputy Disciplinary Administrator in his response to the Deputy Disciplinary Administrator's closing argument. Finally, the Respondent's cross examination of Ms. Friedheim was abusive. Accordingly, the Hearing Panel concludes that the Respondent engaged in a pattern of misconduct.

"112. *Bad Faith Obstruction of the Disciplinary Proceeding by Intentionally Failing to Comply with Rules or Orders of the Disciplinary Process.* The Respondent intentionally failed to comply with the directives of the Hearing Panel. The Hearing Panel directed the parties to file simultaneous written closing arguments, succinctly stating their position regarding the alleged rule violations and recommendation of discipline, by November 22, 2011, by 5:00 p.m. The Hearing Panel

limited the parties written closing arguments to 10 pages. The Respondent requested permission to file a response to the Deputy Disciplinary Administrator's written closing argument. The Hearing Panel granted the Respondent's request and allowed both parties to file a five page response to the opposing written closing argument by November 29, 2011, at 5:00 p.m.

"113. On November 22, 2011, the Respondent filed his written closing argument late. On November 29, 2011, at 9:59 p.m., the Respondent filed a 22 page response to the Deputy Disciplinary Administrator's written closing argument. The Respondent's 22 page response was rambling, disorganized, repetitive, and grammatically deficient. The Respondent's 22 page response to the Deputy Disciplinary Administrator's written closing argument evidences the Respondent's failure or inability to comply with the Hearing Panel's order.

"114. *Submission of False Evidence, False Statements, or Other Deceptive Practices During the Disciplinary Process.* During the disciplinary proceedings, the Respondent provided a number of exhibits. Some of the exhibits the Respondent provided were not true and accurate copies of original exhibits. Rather, the Respondent had altered the exhibits by highlighting phrases and sentences using the bold font feature. Further, the Respondent did not disclose that the documents had been altered until the exhibits were challenged by the Deputy Disciplinary Administrator.

'MS. KNOLL: This exhibit has been admitted. He's asked this—questions about this exhibit before. The problem I have that I wrote is it appears that this exhibit has been altered. There has been bold type added to emphasize certain phrases that is different than what was originally produced. And at this point I'm objecting on—

'MR. SMALL: What's the other exhibit number, please?

'CHAIRMAN SHARP: Can we get a response to that? Has 101 been enhanced for bolding.

'MR. SMALL: There may have been bold put on it, but that's it. That's so it would be faster to deal with the exhibits since there's so many to draw the attention to the relevant language in the document. Words have not been changed. It's highlighted is what it is.

'CHAIRMAN SHARP: And is that true throughout a lot of the exhibits?

'MR. SMALL: I'd have to look at them. I don't think very often. But there were a couple of them that were very significant that these apparently were bolded on to bring out the contrasts. And there are printouts of the originals here and you can compare them and see.'

Accordingly, the Hearing Panel concludes that the Respondent submitted false evidence or engaged in other deceptive practices during the disciplinary proceeding.

"115. The Respondent also engaged in deceptive conduct in making certain statements in his 22 page response to the Deputy Disciplinary Administrator's closing argument. Specifically, the Respondent stated:

'The Disciplinary Administrator [*sic*] failed to mention that she demanded that Respondent confess numerous violations including interference with the administration of justice, lying about a judge in work product drafts un-filed and unpublished anywhere, failing to report a judge, that lien letters are violations of Rule 1.6, that the Letter to Bell-Lloyd was not required under *Nelson v. Miller*. She demanded that without confession to these unsustainable allegations she would not make a recommendation. She announced on October 4, 2008, she was not claiming to seek suspension and found Respondent fixated in that regard, yet her argument is for suspension, exactly what she said she was not after. The Hobson's choice was to confess to violations that were unsustainable and could merit harsh punishment or to defend. There was no choice but to defend, and a lawyer should not be subject to enhanced punishment or punishment for defending. The demanded confessions were based upon ill founded and defective probable cause based upon a faulty investigation and a complaint based upon the fraudulent assertion the work was paid for with a lamp. Despite requests that the prosecutor and investigator acknowledge the probable cause was faulty and that Respondent be permitted to discuss the Investigator's [*sic*] concerns leading to the probable cause on charges since abandoned the requests were denied, and prosecution perpetuated.

'The Disciplinary Administrator [*sic*] has repeatedly advanced misplaced beliefs. Her beliefs are not evidence of violations nor justifications to impose unwarranted, excessive or draconian discipline under inapplicable standards. Some beliefs appear in the Formal Complaint, such as the abandoned belief Mrs. Friedheim procured dismissal of the fee suit and the argument the claim was abandoned when in fact the record showed it was dismissed without prejudice and the claim preserved, the misplaced belief that counsel was paid with a lamp, and otherwise. Exhibits were grouped together which were not unitary documents. Continual threats of amendments were made resulting in the loss of counsel's representation in this matter. Additionally, the matter of an unpublished work product draft mandamus action and affidavit being a false statement (abandoned) a need to file a complaint about the fitness of a judge (abandoned) misleading argument concerning an e-mail to the effect the judge was accused of assisting a theft, that statutory lien letters violate confidentiality (abandoned and contrary to the lien statutes and Rule 1.6), that a demand letter is improper (contrary to *Nelson v. Miller*) that one should apparently write the client to create potential misunderstandings Rule 4.2 is designed to prevent, and that counsel should confess to alleged violations the Disciplinary Administrator abandoned as contrary to fact and law. On at least 2 occasions during the hearing she corrected Mrs. Friedheim [*sic*] with respect to not owing payment of money and a trade of a lamp. . . .'

"116. First, procedurally, the Deputy Disciplinary Administrator informed the Respondent that he was eligible to enter the attorney diversion program—an

alternative to the traditional disciplinary hearing process. In order to enter the attorney diversion program, however, a Respondent is required to stipulate to the factual allegations and rule violations. Kan. Sup. Ct. R. 203(d)(2). Thus, the Respondent's statements and arguments that the Deputy Disciplinary Administrator 'demanded that Respondent confess numerous violations' is not persuasive, but rather misleading.

"117. Next, on October 4, 2011, the Deputy Disciplinary Administrator did not announce that 'she was not claiming to seek suspension and found Respondent fixated in that regard.' On October 4, 2011, the Hearing Panel convened and took up the Respondent's motion to continue the hearing. During the proceedings that day, the following exchange between the Deputy Disciplinary Administrator and the Respondent occurred:

'Q. [By the Deputy Disciplinary Administrator] And the bottom line, at least the way I'm reading this, is you needed to indicate what you wanted, that you had been offered non-disciplinary—non-traditional disciplinary action under the diversion program and I just needed to know if you wanted to go to a hearing or if you wanted to pursue something else?

'A. [By the Respondent] My understanding was what I was offered was to give you a complete release of my medical history, to have a lawyer come in and operate my office, to undergo psychiatric evaluation, drug testing. I mean, I didn't understand where any of this was coming from. When you understand more about my client, you may understand she's—

'Q. Sir, I'm going to ask you not to attack the complainant.

'A. I'm not attacking anyone here. I'm simply saying I was—I was told there was an investigative report months after it had been filed. I never had a chance to follow up with any questions the investigator may have had. Then apparently there was a probable cause determination based upon this report and then I heard from you saying that the investigator recommended I be suspended from the practice of law, but that you were recommending that I have—your office was recommending that I have diversion. And I think it's—I looked at some of the correspondence last night. I thought you said an informal admonition, but then you wanted me to do a diversion program and I just I needed to understand the complaint and the law and the factual basis for it before I could make a decision.'

The exchange above is the only reference made during the October 4, 2011, proceeding, to the suspension of the Respondent's license to practice law. At no time during the October 4, 2011, hearing, did the Deputy Disciplinary Administrator make the statement which the Respondent has attributed to her. Again, the Hearing Panel concludes that the Respondent made false statements and engaged in deceptive practices.

"118. In his response to the Deputy Disciplinary Administrator's closing argument, the Respondent also argued that he should not be subject to enhanced discipline for defending the disciplinary case. Participation in the attorney diversion program is voluntary, as the Respondent knows. The Respondent chose to decline the Deputy Disciplinary Administrator's terms and conditions for participation in the diversion program. Accordingly, the Kansas Supreme Court Rules require that traditional disciplinary proceedings resume. Once traditional disciplinary proceedings resumed and the matter proceeds to hearing, the Respondent is no longer eligible to participate in the attorney diversion program. Further, the Deputy Disciplinary Administrator is free to make a recommendation for discipline based upon all known information, including information that develops during the formal hearing. Finally, neither the Hearing Panel nor the Court is bound by any recommendations of the party. Thus, the Respondent's argument that he should not be subject to 'enhanced' discipline lacks merit.

"119. Further, the Respondent argued that the Disciplinary Administrator has repeatedly advanced misplaced beliefs. The Deputy Disciplinary Administrator filed the formal complaint based upon information and belief. The Respondent filed his answer based upon information and belief. The proper time to determine which facts to accept and which facts to reject came at the time of the formal hearing. Just because a fact is rejected by the Hearing Panel does not necessarily mean that the party asserting the fact made a false statement or allegation. Often parties have differing views of the same set of circumstances or events. The reason we have contested hearings and trials is to make those factual determinations. The Respondent's inference that the Deputy Disciplinary Administrator engaged in wrongdoing by including certain facts in her formal complaint is sophomoric and lacks merit.

"120. Finally, the Respondent argued that the Deputy Disciplinary Administrator made continual threats of amendments which resulted in 'the loss of [the Respondent]'s representation in this matter.' Only one attorney entered his appearance in behalf of the Respondent in the disciplinary case, Sheldon Bernstein. Additionally, the Deputy Disciplinary Administrator made only one attempt to amend her formal complaint. She attempted to add an allegation that the Respondent violated KRPC 1.1.

"121. From the statement in his response to the Deputy Disciplinary Administrator's closing argument, the Hearing Panel concludes that the Respondent is arguing that because the Deputy Disciplinary Administrator informed Mr. Bernstein that she planned to amend the formal complaint to include a violation of KRPC 1.1, that Mr. Bernstein withdrew from the representation of the Respondent. The Respondent's argument lacks merit and is false.

"122. During the October 4, 2011, hearing, Mr. Bernstein stated, '[a]s I can point out, my client and I may have some philosophical differences so obviously we're not as well prepared as we'd like to be and be on the same page.' Further, on October 27, 2011, Mr. Bernstein filed a motion for leave to withdraw. In support of his motion, Mr. Bernstein stated '[p]ursuant to Rule KRPC 1.16(b)(5),

the parties have philosophical and legal differences of opinion.' It is clear that Mr. Bernstein withdrew from his representation of the Respondent because of philosophical and legal differences of opinion. Thus, the Respondent's attribution of fault to the Deputy Disciplinary Administrator's 'continual threats of amendments' is false and deceptive.

"123. The Hearing Panel concludes that the Respondent repeatedly made false statements and engaged in deceptive practices during the disciplinary proceeding which aggravates the misconduct in this case.

"124. *Refusal to Acknowledge Wrongful Nature of Conduct*. The Respondent has refused to acknowledge the wrongful nature of his conduct. In the final pleading filed by the Respondent, the 22 page response to the Deputy Disciplinary Administrator's written closing argument, the Respondent blamed his troubles on the Deputy Disciplinary Administrator and the attorney investigator. While the Respondent has repeatedly complained that his client, the Bluhms, Mr. Rank, the Deputy Disciplinary Administrator, the attorney investigator, and Judge Sutherland were at fault, he has not once suggested that at any time he did anything improper. The Respondent's refusal to acknowledge his misconduct is an aggravating factor worthy of consideration.

"125. *Substantial Experience in the Practice of Law*. The Kansas Supreme Court admitted the Respondent to the practice of law in 1986. As such, the Respondent has 25 years of experience practicing law. The Respondent's emotional response to adversity is what one might see with a lawyer fresh out of law school—not after 25 years of practice. Certainly, the Respondent's experience should have provided him with the tools necessary to avoid this type of misconduct.

"126. Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following mitigating circumstance present:

"127. *Absence of a Prior Disciplinary Record*. The Respondent has not previously been disciplined. The Respondent's lack of a prior disciplinary record is a mitigating circumstance in this case.

"128. In addition to the above-cited factors, the Hearing Panel has thoroughly examined and considered the following Standards:

'7.2 Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system.'

"Recommendation

"129. The Disciplinary Administrator recommended that the Respondent be suspended from the practice of law. The Respondent argued that the Disciplinary Administrator failed to establish a violation of the Kansas Rules of Professional Conduct and that the case should be dismissed.

"130. The Hearing Panel is troubled by the Respondent's *modus operandi*. The Respondent makes threats as a matter of standard practice. When the Respondent was met with disagreement, the Respondent responded by making threats and using intimidation tactics. He threatened and attempted to intimidate Mr. Rank, Judge Sutherland, the attorney investigator, and the Deputy Disciplinary Administrator.

"131. The Respondent went from collecting a fee to a personal vendetta. When the Respondent personalized the litigation, the Respondent showed a serious lack of professionalism. The Respondent['s] lack of professionalism is part and parcel of the violation in this case.

"132. The Respondent thought that he had a client with significant financial resources, but he did not. And, when he was burned by his client who entered into an absurd rental agreement, he should have withdrawn and walked away from the bad deal. Instead, he became vindictive and wanted to punish everyone involved. The Respondent must come to realize that if he continues to practice law, he will be repeatedly disappointed in the results of his cases as are all lawyers and he has to learn to live with that instead of setting out to punish all who disagree with him.

"133. Based upon the findings of fact, conclusions of law, and the Standards listed above, the Hearing Panel unanimously recommends that the Respondent be suspended from the practice of law for a period of 90 days.

"134. Costs are assessed against the Respondent in an amount to be certified by the Office of the Disciplinary Administrator."

## DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties and determines whether violations of KRPC exist and, if they do, the discipline to be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see Supreme Court Rule 211(f) (2012 Kan. Ct. R. Annot. 350). Clear and convincing evidence is " 'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable." ' " *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

The respondent was given adequate notice of the formal complaint, to which he filed an answer, and adequate notice of both the hearing before the panel and the hearing before this court. The respondent filed a pleading indicating an intention to file exceptions to the hearing panel's final hearing report. However, after

multiple extensions of time, he failed to brief any exceptions. This matter was therefore deemed uncontested by order of this court on October 22, 2012.

With no exceptions before us, the panel's findings of fact are deemed admitted. See Supreme Court Rule 212(c), (d) (2012 Kan. Ct. R. Annot. 368). Furthermore, the evidence before the hearing panel establishes the respondent's misconduct in violation of KRPC 8.4 (d) and (g) (2012 Kan. Ct. R. Annot. 643) by clear and convincing evidence and supports the panel's conclusions of law. We therefore adopt the panel's conclusions.

The only remaining issue before us is the appropriate discipline for respondent's violations. At the hearing before this court, the office of the Disciplinary Administrator recommended that the respondent be suspended from the practice of law for 1 year. The respondent argued that the case should be dismissed and no discipline imposed. We hold that the violations proved and respondent's apparent inability to acknowledge any wrongdoing or address the relevant issues at oral argument before this court demonstrate the need for a period of suspension.

## CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Stephen B. Small be suspended from the practice of law in the state of Kansas for 6 months, effective on the filing of this opinion. It is hoped that this period of suspension, sooner rather than later, will impress upon respondent the seriousness of his situation and the necessity that he seek professional counsel and assistance in order to regain his ability to practice law.

IT IS FURTHER ORDERED that the respondent shall comply with Supreme Court Rule 218 (2012 Kan. Ct. R. Annot. 397), as amended December 1, 2012.

IT IS FURTHER ORDERED that the respondent shall be subject to a Rule 219 reinstatement hearing before his suspension may be lifted. (2012 Kan. Ct. R. Annot. 398), as amended December 1, 2012. The required petition for reinstatement must be accompanied by a written report from a licensed psychiatric, psychological,

or social work professional approved by the Kansas Lawyers Assistance Program. The report must include an opinion that there are no current impediments to respondent's ability to practice law, and the reinstatement panel must satisfy itself from the information in that report and any other evidence submitted to it that respondent has addressed the problems that led to his misconduct and suspension, before this Court will consider lifting the suspension.

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas reports.